May it please the Court, I'm Arthur Allen. I represent the appellant Lonnie Lillard. Mr. Lillard has raised three issues on appeal. The government has conceded the second issue, that being an illegal sentence, and has agreed to a remand for resentencing. Unless the Court wishes otherwise and if time permits, I'd like to try to address both of the remaining issues, the first being an illegal search, the second being a question of the trial court's determination of restitution. Your Honor, without going into the facts unnecessarily, the record discloses that police investigating a credit card scam operation went to the Treasure Island Resort in Las Vegas. They were armed with a search warrant allowing them to search room 26006, at which time they discovered what they've fraud case. There were encoders there. And significantly, the officers described, if I may, the use in that room of a credit card encoder device, which allowed them to look at the strip on the back of a credit card or debit cards in some instances and determine that it did not match the name embossed on the front of the credit card. In a matter of contested evidence, and it frankly is not important, I would submit, the officers found information that led them to a second room, that room being 27050, one floor up. It's debated, and the parties spent a large amount of time arguing whether there were credit cards, driver's licenses, identification cards, wallets, day planners. None of that, Your Honor, really gets to the crucial issue, did they have any probable cause to arrest Mr. Lillard. Without a warrant, they proceeded up to the 27th floor and entered that room. And without probable cause, they took Mr. Lillard into custody. Let me ask you about the probable cause question. Because there were a number of things that tied your client to this operation at the time of the entry. His identification was found in the 006 room. His day planner was found there. One of the people that they talked to said that this person was staying in 27050, and that he had been returning merchandise to the mall for him. The detective knew that he himself had a previous history of forgery and counterfeiting. So there were a number of items that were known before the entry. Why wasn't that probable cause to believe that he was part of this operation when he was at the same hotel with his materials in this sort of little fraud factory? Unfortunately, Your Honor, Detective Thomas' story changed colors more often than a chameleon in that regard. None of that evidence. Now, he did, at some point he actually said there was nothing found in the room but either an identification card or a driver's license with Mr. Lillard's name on it. The best evidence of what he knew contemporaneously is found in the affidavit prepared for the search of room 27050, which never got or actually did not get submitted to a magistrate before they entered that room and took Mr. Lillard into custody. Detective Thomas even testified at one point on cross-examination that he had no probable cause to take Mr. Lillard into custody. The day planner, and again, I concede there that the record here could be much better for a number of reasons on what was taken from which room. But when we look at the affidavit being prepared, what it tells us, they went into room 2707 or 050, and in that room, Detective Thomas says, we found cards that were encoded with a different name, whether they were in a wallet, whether they were in a day planner. Mr. Lillard said he was undressed and in bed. Detective Thomas said he was coming out of the shower and had on a bathrobe. None of that bears on whether there was probable cause at the time of the entry, what he was wearing or not wearing and all of that. But it does go to show that what they took off of him in the room when they arrested him was not on his person. And in the affidavit, Detective Thomas says the cards, and this, Your Honor, is at excerpt of record 120 or I'm sorry, 126 and 237. When they get to room 27050, whether again it's a wallet or a day planner, it was not on Mr. Lillard. Detective Thomas said that they had to use an encoder. Again, they used an encoder to look at evidence that they seized without a warrant and I would submit without probable cause and determine that it showed different names on the magnetic strip than it did on the front of the embossed cards. That was a search. It went beyond, and again, went beyond just merely taking Mr. Lillard into custody. His license being in room 26006, he could have been a victim of the scam. Mr. Lillard seriously ---- for him as well as for others. Your Honor, the affidavit that Detective Thomas prepared did not contain that. That became one of Detective Thomas's later versions of what occurred. In the affidavit, which was then executed the following day, July 28th, there is absolutely no reference to talking to these ladies. There were affidavits submitted in the course of the sentencing proceeding when Mr. Lillard ---- But he testified to this under oath, that he had this information. Correct? You think it's less worthy of belief than an affidavit that was never presented, but he testified live before the court. Oh, I'm sorry. You mean Detective Thomas? Yes, I'm sorry. Yes, I'm sorry, Your Honor. There was an indefinite reference. I apologize. But what we look at when we're looking at the validity of searches, Your Honor, we don't judge them by later known discovered evidence. In the affidavit that was sought for the search of room 27050, it specifically says, we found credit cards that were encoded in different names. This helps us have cause to search this room. In other words, they bootstrapped the illegal search, put evidence into the new affidavit, and then gone and done a new search. This is not what Segura, it is not what Lancelotti cited by the government. What did they have that took them to the second room? They're, again, a conflicting version, Your Honor. By one account, the three ladies who later came to the room said, we're looking for someone, he might be in this room, he might be in the room on the 27th floor. By a different account, they ran what they called a triple three report and found out that Mr. Lillard had a past record. Even given that, even for sake of argument, were that true, they still have nothing but an identification and an ID of some form belonging to Mr. Lillard. Your Honor, I would submit that that does not constitute probable cause for the warrantless search. Even probable cause, as this Court has said, still does not allow entry past a private resident's door going back to the Payton case. And that's exactly what happened here. They did an illegal search. They cited all of this exigent circumstance. He might burn it. He might put them in chippers. He might throw them out windows. If that were the case, and I don't want to use hyperbole, but were that the case, then everything would be an exception, because every search would say, well, had we not gone in there, they could have burned it, they could have thrown it out windows, they could have eaten it. Counsel, before you run out of time, did you want to say anything about restitution? Yes, Your Honor, I do. Thank you. The restitution here, and again, as I said, the record here is less than sterling in some regards. But Mr. Lillard, and he was acting pro se at that time, objected to both the amount of restitution and the failure for the trial court to consider offsets. There was money recovered on these credit cards and money orders, and the government in their brief says, well, one of the gentlemen from Paymentech said, we never got any money back. Well, that was true at the time of the trial, but by the time we're here today, if the court actually looks at both the government supplemental excerpts and at the government clerk's record at entry — sorry, I'm trying to find the correct — the entry at sentencing, the government gave back an undetermined amount of money to Paymentech. I don't understand that. The Chase Payment Solutions reimbursed the merchants who otherwise would have lost money, correct? Yes, Your Honor. And the judgment orders that defendant is to pay restitution to that entity. It's the out-of-pocket entity now. So that is the victim at this point. I don't understand your argument that we don't know who the victim is. I'm sorry, Your Honor. It's not a matter of who the victim is. At entry 178 in the clerk's record and at the transcript of the sentencing hearing, the government's civil attorney says we have now reached an agreement with Paymentech to dismiss their petition for return of monies because we have reached an agreement whereby restitution will be made payable to them. The government paid over to them some undetermined amount of money. This takes this out of the U.S. versus Bright situation, which discusses at length the Mandatory Victim Restitution Act, because Bright specifically says we are not reaching the issue here of what we do when the government has actually paid money over to a victim as occurred in this case. We don't. You have about a minute and a half. May I reserve that for rebuttal? Yes. Thank you, Your Honor. May it please the Court, Peter Levitt for Appley, United States of America. Your Honor, I'd like to clarify, first of all, what I believe to be a bit of a factual confusion about what the women who entered 26006 said to Detective Thomas. In the search warrant affidavit, this is Excerpts of Record 126, paragraph 4, it states this is Detective Thomas' recitation to the Nevada State Judge. The females stated that they knew this person. They had just shown him the photo Washington State ID bearing his name and photograph. The females stated they knew this person as Antwon. Prior to Lillard being brought to room 26006, the females were shown the Washington State identification card found in 26006 for Lillard, and they stated that the person in the photo on the identification card was Antwon. Now, in addition to that, as Judge Graber correctly pointed out, the women also stated, and this is at Excerpts of Record 255, that they were with Antwon and they had been returning merchandise to the mall for him. Now, when did this evidence come in? Opposing counsel says it didn't come in until sentencing or? Your Honor, the information and the evidence regarding the positive identification of Lillard's photograph as Antwon with whom they were staying in 2750 was in the search warrant affidavit. Now, the other statements regarding returning merchandise were introduced at the suppression hearing before the magistrate. As counsel and the Court has focused on, the quantum of proof necessary for probable cause to search and probable cause to arrest is the dispositive issue in this case. Under the independent source rule, as articulated in Segura and Lancelotti, where the officers enter and secure a room without a search warrant, and they ultimately seize evidence pursuant to a search warrant, we ask a solitary question whether there was an independent source for the discovery of the evidence ultimately seized pursuant to the warrant, and here there most assuredly was. We've touched upon just a little bit of the quantum of proof known to the agents before they ever knocked on 2750. First, Mr. Klein of Chase Paymentech had come to the Secret Service and said there had been over 400 bogus refund calls that had been placed in the days preceding, and this was an in-progress, ongoing fraud. It had originated from the Treasure Island Hotel and Casino in Las Vegas, Nevada. They went on July 27th to the Treasure Island Hotel and Casino. They spoke to hotel security and determined that 26006 was the room that was originating these calls. Did the police simply rush up there? They did not. They sat down and they wrote a search warrant affidavit to search the room. They then went after that had been approved. They went up. There was nobody in the room. Inside, they found a large cachet of evidence pointing not only at the forgery laboratory, an ongoing in-progress scheme that had troubled Mr. Klein, but also evidence pointing squarely at multiple convicted fraudster Lonnie Lillard, who is then, they determined, also registered in 2750. In addition to a merchant credit card terminal and a keypad, it was hooked up to a laptop computer. The paper in the terminal bore Green Valley Pet Stop. Evidently, the fraudsters had obtained this from that now-defunct merchant. There were money orders and receipts dating from the time reported by Mr. Klein, July 25th to 26th, in amounts ranging from $450 to $1,000. There were re-encoded gaming cards, checks, credit cards, prepaid visa cards, ATM cards, and name-labeled Post-its. There was also, in Lillard's day planner, a Washington driver's license with a picture of a black male adult in the name of Lonnie Eugene Lillard. There were also Lillard's credit cards, Lillard's players' club card, money orders, gift cards, receipts, and checks payable to Mr. Lillard's account. Hotel Security ran the name, found that 2750 was registered to Lillard himself. The evidence doesn't stop there. The law enforcement then runs his criminal history check. And before ever knocking on 2750, they find out that Lillard has multiple convictions for fraud, counterfeiting, and possessions of stolen goods. That's an excerpt of the record, and the magistrate's so found in excerpts of record at 86, and it's also in the affidavit at excerpts of record 124, 125, paragraph 2, and also, well, it's in paragraph 2, and it's in excerpts of record at page 79 and 86. And at page 79, the magistrate finds that given the overwhelming evidence of a forgery lab was operating out of Treasure Island and the additional information regarding Lillard, based on that, they seek a search warrant. And that additional information encompasses the criminal history check. While all this goes on, Codefendant Bryant comes to the room and flees. But in addition to that, the three females arrive in the room, and one of them, Nadia, comes three minutes after Bryant flees. She identifies Lillard's picture, says she's staying with him in 2750, and the other two women and Nadia join and say they've been returning merchandise to the mall, and they were involved with Lonnie Lillard. All of this information, derived from, to use Secura's language, sources wholly unconnected to the entry and known to the agents well before the initial entry. So like Lancelotti, there was ample information independent of the warrantless entry to furnish probable cause for the search warrant under which the incriminating evidence was ultimately seized in 2750. I guess part of the challenge is to the fact that they entered, you've explained what the probable cause was, and they could have gotten a warrant, and they entered before they got it. What's your authority for that? I think I know from your brief, but what's your authority for that? Maybe you want to touch on it. Well, Your Honor, first of all, it's important to view this through the prism of Secura, where the Court writes, in other words, the initial entry, whether reasonable or not, does not affect the reasonableness of the seizure. Was any, actually, was any evidence at issue resulting from that initial entry? Well, what happened as a result of the initial entry, Your Honor, all that the arresting officers arguably seized were, it's not clear from the record, it seems a credit card or two that Lillard had been re-encoded, and that's the minimus compared to the cash. Of course, what they got, I suppose, was Lillard. That's quite correct. Some evidence followed from that, I guess. But the magistrate pointed out, and there's no reason to doubt it in the face of such overwhelming evidence, that even if this were excised from the search warrant affidavit, there would still exist abundant probable cause to enter and search Room 2750. The district court adopted the magistrate's finding in excerpts of record, page 86. And again, the test for probable cause to search 2750 is whether that there's evidence that it furnished a fair probability that contraband would be found there. The test for probable cause to arrest is similarly framed in the search warrant whether there is a reasonable basis to believe that the person is, has committed, is committing, or is about to commit an offense. And here there was overwhelming evidence that there was a fraud in progress. People were coming to the room, 26006. One of them fled. There was abundant evidence that this fraud was in progress and Lillard was involved with it. Counsel, I'm going to ask you the same question as I asked opposing counsel. Before you run out of time, would you talk briefly about the restitution question? Your Honor, the restitution order of $675,571.35 is correct. It is accurate, and it is grounded in record evidence. Supplemental excerpts of record, pages 19, pages 19 to 31, actually correspond to Trial Exhibit 1 at the trial in this case. And in that, Mr. Klein at trial painstakingly went through each of the 402 bogus authorizations. He totaled them up, and that came out to precisely the restitution amount, $675,571.35. What about the contentions that there was a lot of repayment or that cards were not used so that it should have been reduced by $100,000 or so? Well, first of all, Your Honor, Paymentech has reimbursed all the merchants for that exact quantity. Paymentech is the only victim. And Paymentech to date has not recovered any money. They have not. After this appeal, that made change. But let's assume that it does. Let's assume that certain monies, and let's assume it's $100,000, are that were frozen on the income cards are paid over to Paymentech. At that point, under this Court's opinion in Bright, the Court can offset the restitution amount. But even in that case, the government would step into Paymentech's shoes as subrogee for that full amount. The forfeiture amount, the amount the forfeiture amount is the penalty to the government, that may decrease, but the restitution amount will not under this Court's analysis in Bright. All of this, however, is academic, because there's no record evidence, and I'm aware that to date, Paymentech has still received nothing, not from the forfeiture fund, not from civil suit for damages where forfeited assets were treated as compensatory damages. That's one of the Bright hypotheticals. So for all of these reasons, Your Honor, we would urge that the judgment and conviction on counts 1 and 2 be affirmed. My colleague, Mr. Allen, is correct. The case should be remanded for the solitary purpose of correcting the sentence as to count 3, which exceeds the statutory maximum. And with the time I have remaining, I would point out, Your Honor, that there is an incorrect statement, citation in my answering brief to United States v. Boulware where I cited 384, Fed 3rd, 784, and it should be 794. What's the value of the government's forfeiture claim that would cause the – would be the source of their segregation? The forfeiture claim, the way it's pled in the latest version of the indictment, is up to $675,000. Thank you, counsel. Mr. Allen, you have some rebuttal remaining. Thank you, Your Honor. Please, the Court, going back, Your Honor, to your question of giving weight to the sworn testimony, Detective Thomas, at excerpt of records 220 on being queried during the suppression hearing, was asked the following question. So you're saying basically you didn't have probable cause to arrest Mr. Lowe and Mr. Lillard until after the search of room 27050? His answer, exactly. That's a legal conclusion, probable cause, though. Well, and – He might have thought he did and didn't, and vice versa. He might have thought he didn't, but he did. Correct, Your Honor. But coming back, we still boil to his essence. We have an identification card found in a room that is not registered to Mr. Lillard. The initial warrant for the search of the room on the 26th floor never mentioned Mr. Lillard. In fact, the Mr. Johnson to whom that room was rented, the police initially thought that that was Mr. Lillard. They later had to concede their error in that regard. If I may, very briefly on the restitution. Under the Act, the Court has to set an amount of restitution. We don't dispute that. But what the Court failed to do was recognize the availability of offsets. The Government has, and unlike Bright and specifically excluded under Bright, is the question of when the Government pays money back to a victim, as they've said they're doing in this case, we don't know how much. The Court needs to do an offset inquiry on that. The case is going back for a limited remand. On the sentencing issue, I submit it would be appropriate for this Court to direct the district court to do an inquiry. The Government says they haven't been paid yet. I don't know if they're waiting for us to get home tonight or what exactly, because there is a deal cut for an undisclosed amount. That would be an offset. And the district court did not, and I think the record will show the court, this court, why the district court had a lot of frustration in dealing with some of these issues, but the court essentially stopped short of fulfilling its obligation on resolving the restitution question. Thank you, counsel. We appreciate very much the arguments of both counsel. The case is submitted.
judges: Fletcher B. , Canby, Graber